IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SALVATORE CHIMENTI, ET AL. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| JOHN WETZEL, ET AL. | : | NO.  15-3333 |

## MEMORANDUM

**Padova, J.**                                                                    **July 12, 2018**

Plaintiffs Salvatore Chimenti, Daniel Leyva, and David Maldonado have brought this lawsuit on behalf of a class of similarly situated individuals against John Wetzel, the Secretary of the Pennsylvania Department of Corrections (the "DOC"), and Paul Noel, the Chief Medical Director of the DOC (collectively the "DOC Defendants"), as well as two companies that have contracted to provide medical services for the DOC and officials and employees of those companies (collectively the "Medical Defendants"[1]), asserting claims regarding the medical care provided to DOC inmates who have been diagnosed with Hepatitis C viral infections ("HCV"). Specifically, Plaintiffs contend that the DOC Defendants have violated their rights under the Eighth Amendment and the Pennsylvania Constitution by adopting a policy for the treatment of inmates with chronic HCV that fails to provide them with appropriate medical care.  Plaintiffs seek injunctive relief requiring the DOC Defendants to formulate and implement a Hepatitis C treatment policy that (1) meets community standards of care for patients with chronic HCV; (2) ensures that inmates with chronic HCV are treated with medically necessary and appropriate direct-acting antiviral drugs ("DAAs"); and (3) provides ongoing monitoring and medical care in accordance with the standard of care for such patients' liver fibrosis and cirrhosis.  In addition, Chimenti has

---

[1] The Medical Defendants are Wexford Health Sources, Inc., Correct Care Solutions, LLC, Dr. Jay Cowan, Dr. John Kephart, and Dr. James Frommer.

also brought personal claims for medical malpractice against all Defendants for which he seeks monetary damages. Before the Court is the DOC Defendants' Motion for Summary Judgment. For the reasons that follow, the Motion is granted in part and denied in part.

## I.    FACTUAL BACKGROUND

Plaintiffs Chimenti, Leyva, and Maldonado all suffer from chronic HCV and were, at the time of the filing of this action, incarcerated in correctional institutions that are part of the DOC. (See Compl. (Docket No. 1) ¶¶ 1-2; DOC Defs.' Ans. to Compl. (Docket No. 30) ¶¶ 1-2.) Beginning in 2011, the United States Food and Drug Administration ("FDA") approved DAAs for the treatment of Hepatitis C. (Trooskin Rpt., Pls.' Ex. A, at 2.) These drugs, which include Sovaldi, Olysio, and Harvoni, are capable of achieving a "sustained virologic response," which means "the elimination of the virus[,] for more than 90% of patients . . . ." (Id. at 2-3.) Prior to the development of DAAs, the standard of care "was a three-drug treatment containing boceprevir or telaprevir, interferon and ribavirin" that "provided, at best, a 70% cure rate, and was accompanied by significant adverse side effects such as anemia, insomnia, anxiety, depression, nausea, bone pain, muscle [pain], liver failure, joint pain, memory loss, and death." (Id. at 2.) Plaintiffs' expert, Dr. Stacey Trooskin, has opined that the use of DAAs is now "the standard of medical care for the treatment of all HCV individuals . . . ." (Id. at 3.)

When Chimenti, Leyva, and Maldonado first asked to be treated with DAAs, their applications were rejected by the DOC. Chimenti began requesting treatment with DAAs in late 2013, but Defendants denied his requests. (Pls.' Counterstatement of Add'l Facts ("PCSAF") ¶¶ 225-30; DOC Defs.' Resp. to PCSAF ("DRPCAF") ¶¶ 225-30.) Chimenti filed grievances asking for treatment with DAAs in early 2014, but his grievances were denied because the DOC did not have a Hepatitis C protocol and had put all Hepatitis C treatment on hold. (PCSAF ¶¶ 226-28;

DRPCAF ¶¶ 226-28.)  Chimenti has suffered from Stage 4 cirrhosis since at least 2000.  (Pls.' Ex. U at 5.)  In October 2015, Chimenti was found to have a liver mass that was possibly cancerous. (Chimenti Dep., Pls.' Ex. R, at 37-39.)  He was pressured to have a biopsy of the mass, even though a biopsy was not the standard of care and a radiologist refused to do the biopsy.  (Id.)  The lesion is not considered to be cancerous at this time.  (Id. at 40; Pls.' Ex. Q at 1.)  Chimenti was treated with DAAs beginning in October 2016.  (PCSAF ¶ 236; DRPCAF ¶ 236.)  Notwithstanding this treatment, he currently suffers from diabetes that that may be related to his HCV, as well as severe fatigue and memory problems related to hepatic encephalopathy.  (Pls.' Ex. Q at 1.)

Leyva filed a grievance with the DOC on January 13, 2015, asking to be treated with the new Hepatitis C drugs.  (Pls.' Ex. V at 2.) The DOC upheld his grievance, but told him that it was evaluating its treatment options and developing a new treatment protocol and, in the meantime, would only monitor patients with HCV.  (Id. at 3.)  On March 4, 2015, Leyva sent a letter to the DOC expressing his concern about having to wait for treatment while the DOC developed a new treatment protocol for Hepatitis C.  (See id. at 4.)  The DOC responded that it was continuing to monitor inmates with HCV while it evaluated treatment options.  (Id.)  On April 17, 2015, Leyva filed a new grievance, asking to be treated with Harvoni.  (Id. at 5.)  That grievance was denied and the Secretary's Office of Inmate Grievances and Appeals denied Leyva's third level appeal of that decision on September 8, 2015.  (Id. at 7-19.)  Leyva still has not received treatment with DAAs.  (lst Am. Class Action Compl. ("1st Am. Compl.") (Docket No. 50) ¶ 68; DOC Defs.' Ans. to lst Am. Compl. (Docket No. 93) ¶ 13.)

Maldonado also filed a grievance asking to be treated with the latest DAAs.  (DOC Defs.' Ex. B; Pls.' Ex. F.)  The DOC rejected his grievance and has not treated Maldonado with DAAs.

(DOC Defs.' Ans. to 1st Am. Compl. ¶ 16.)  Maldonado was paroled on May 15, 2017 and is not currently incarcerated by the DOC.  (DOC Defs.' Ex. H at 2.)

The DOC issued an Interim Hepatitis C Protocol in November 2015 and began treating some inmates with DAAs.  (DOC Defs.' Statement of Material Facts ("SMF") ¶ 53; Pls.' Resp. to SMF ("PRSMF") ¶ 53.)  The DOC issued a new protocol for the treatment of HCV on November 7, 2016, the "Hepatitis C Protocol."  (SMF ¶ 40; PRSMF ¶ 40.)  Pursuant to the Hepatitis C Protocol, the DOC screens all inmates for HCV with an antibody test and confirms HCV diagnosis with additional testing.  (DOC Defs.' Ex. J §§ B.1, B.2.)  The DOC also advises inmates who have HCV regarding the Hepatitis C Protocol, and keeps track of inmates who have HCV.  (Id. §§ B.4., and C.)  The DOC enters all inmates with chronic HCV into its Liver Disease Chronic Care Clinic. (Id. § G.1.)

Pursuant to the Hepatitis C Protocol, the DOC uses an infected inmates' Aspartate Aminotransferase to Platelet Ratio Index ("APRI") score to estimate hepatic fibrosis, predict the presence of cirrhosis, and prioritize treatment for HCV.  (Id. §§ D.1.b, H.4.)  Fibrosis is designated by Metavir score, which ranges from F0 to F4:  F0 shows no fibrosis, F1 shows periportal inflammation with minimal fibrosis, F2 shows periportal fibrosis with mild bridging, F3 shows periportal fibrosis with moderate bridging, and F4 represents a cirrhotic liver.  (Cowan Dep., DOC Defs.' Ex. L, at 49.)  APRI scores are indirect markers of fibrosis.[2]  (Id. at 43.)  "An APRI score greater than 2.0 suggests a fibrosis score of F3 or F4. . . .  An APRI score between 1.0 and 2.0 suggests a fibrosis score of F2. . . .  An APRI score less than 1.0 suggests a fibrosis score of F0 or F1."  (Noel Decl., DOC Defs.' Ex. N, ¶¶ 19-22.)  As Dr. Noel has explained, "APRI scores are

_____

[2] Both liver biopsy and shearwave elastograpy are more accurate tests for determining a patient's fibrosis level.  (See Cowan Dep., DOC Defs.' Ex. L, at 43-44; Noel Dep., DOC Defs.' Ex. K, at 110; Kendig Dep., Pls.' Ex. K, at 55-56.)

more accurate at the end ranges, i.e. greater than 2.0 and less than 1.0 (F3, F4 and F0, F1.)" (Id. ¶ 23.) APRI scores at the 1.5 to 2 level only have "a sensitivity accuracy of about 48 percent" and an APRI score of 1 would miss approximately 23% of patients with cirrhosis. (Cowan Dep., DOC Defs.' Ex. L, at 42.)

The Hepatitis C Protocol requires follow-up appointments at the Chronic Care Clinic for inmates who are diagnosed with Metavir scores of F0 to F2 every six months, for those with Metavir scores of F3 every three months, and for those with Metavir scores of F4 every month. (DOC Defs.' Ex. J § G.3.d.) While all patients diagnosed with chronic HCV are followed at the Chronic Care Clinic, they are not all treated with DAAs to cure their HCV. Instead, the Hepatitis C Protocol requires the DOC to treat the sickest inmates first, and it bases treatment decisions on an inmate's Metavir scores, as estimated by APRI scores. (SMF ¶¶ 45, 53; PRSMF ¶¶ 45, 53; DOC Defs.' Ex. J § H.4.) According to the Hepatitis C Protocol, inmates with cirrhosis are Priority Level 1 – the highest priority for treatment with DAAs. (DOC Defs.' Ex. J § H.4.a.) Inmates with APRI scores greater than 2, or who have shown to have Metavir scores of F3 on a liver biopsy, as well as inmates who are coinfected with Hepatitis B or HIV, are Priority Level 2. (Id. § H.4.b.) Inmates shown to have Metavir scores of F2 on liver biopsy, APRI scores of at least 1.5 and less than 2.0, or who have diabetes, are Priority Level 3. (Id. § H.4.c.) Inmates with Metavir scores of F0 to F1 on liver biopsy are Priority Level 4, as are all other inmates with HCV infections who meet the DOC's criteria for treatment. (Id. § H.4.d.)

Fewer than 10% of DOC inmates with chronic HCV have been treated with DAAs under the Hepatitis C Protocol. (PCSAF ¶ 178; DRPCAF ¶ 178.) As of September 20, 2017, the DOC held 7,521 inmates who have been infected with Hepatitis C, 5,265 of whom have chronic HCV.

(Wenhold Decl., DOC Defs.' Ex. F, ¶¶ 15-16.) The DOC has treated 297 of its inmates who have chronic HCV with DAAs. (Id. ¶ 17.)

The First Amended Complaint states four claims for relief on behalf of the following class:

> all persons who are currently incarcerated in a Pennsylvania Department of Corrections facility with a diagnosed condition of Chronic Hepatitis C, and who have at least twelve (12) weeks or more remaining to serve on their sentences, and who have a life expectancy of over one year.

(5/24/18 Order, Docket No. 108.) Count I asserts a claim pursuant to 42 U.S.C. § 1983 against the DOC Defendants and two of the Medical Defendants[3] on behalf of the three named Plaintiffs and the Class for deliberate indifference to the serious medical needs of prisoners infected with HCV in violation of the Eighth Amendment to the United States Constitution. (1st Am. Compl. ¶ 90.) Count II asserts a claim for injunctive relief against Wetzel on behalf of the three named Plaintiffs and the Class for violation of Article I, § 13 of the Pennsylvania Constitution. (Id. ¶ 92.) Count III asserts a claim against Dr. Noel and the Medical Defendants for medical malpractice on behalf of Chimenti. (Id. ¶ 94.) Count IV asserts a claim against Correct Care Solutions, LLC and Wexford Health Sources, Inc. (two of the Medical Defendants) for medical malpractice on behalf of Chimenti. (Id. ¶ 96.) Plaintiffs seek an injunction on behalf of themselves and the Class ordering the DOC to:

> (a) formulate and implement a Hepatitis C treatment policy that meets the community standards of care for patients with Hepatitis C, (b) that members of the Class be treated with medically necessary and the appropriate direct-acting antiviral drugs based on individual medical testing and medical evaluation regarding each individual's Hepatitis C status, and (c) that members of the [C]lass receive ongoing monitoring and medical care per the standard of care for their individual level of liver fibrosis and cirrhosis, including but not limited to appropriate access to and

---

[3] Count I asserts a claim for both injunctive relief and monetary damages. Plaintiffs seek injunctive relief in Count I on behalf of themselves and the Class against the DOC Defendants only. Plaintiffs seek monetary damages in Count I only on behalf of Chimenti and they seek to obtain damages from Dr. Kephart and Dr. Frommer as well as the DOC Defendants.

evaluation by a hepatologist and assessment regarding their need for partial or full liver transplant.

(<u>Id.</u> ¶ 98.)  Plaintiffs also seek compensatory and punitive damages for Chimenti, reasonable attorney's fees and costs, and such other relief as the Court deems just and equitable.  (<u>Id.</u> ¶¶ 99-102.)

## II.     LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A factual dispute is "material" if it "might affect the outcome of the suit under the governing law."  <u>Id.</u>

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  Where the nonmoving party bears the burden of proof on a particular issue at trial, the movant's initial <u>Celotex</u> burden can be met simply by "pointing out to the district court" that "there is an absence of evidence to support the nonmoving party's case."  <u>Id.</u> at 325. After the moving party has met its initial burden, the adverse party's response "must support the assertion [that a fact is genuinely disputed] by:  (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials [that the moving party has] cited do not establish the absence . . . of a genuine dispute."  Fed. R. Civ. P. 56(c)(1).  Summary judgment is appropriate if the nonmoving party fails to respond with a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  <u>Celotex</u>, 477 U.S. at 322.  In ruling on a summary judgment motion, we consider "the

facts and draw all reasonable inferences in the light most favorable to . . . the party who oppose[s] summary judgment." Lamont v. New Jersey, 637 F.3d 177, 179 n.1 (3d Cir. 2011) (citing Scott v. Harris, 550 U.S. 372, 378 (2007)).

## III. DISCUSSION

### A.  Count I

The DOC Defendants move to dismiss Count I on the grounds of mootness, failure to exhaust administrative remedies, lack of standing, and because the record does not support Plaintiffs' claims that they were deliberately indifferent to Plaintiffs' serious medical needs in violation of the Eighth Amendment.  We address these arguments in turn.

####  1.  Mootness

The DOC Defendants argue that we should dismiss Maldonado's request for injunctive relief as to Count I because it is moot.  As we mentioned above, Maldonado was paroled on May 15, 2017 and is not currently incarcerated by the DOC.  (DOC Defs.' Ex. H at 2.)  "Generally, courts have held that an inmate's release from a correctional institution makes his or her claims for injunctive relief moot."  Sutton v. City of Phila., 21 F. Supp. 3d 474, 480-81 (E.D. Pa. 2014) (citations omitted).  "The mootness doctrine requires that an actual controversy exist at all stages of review, not merely at the time the complaint is filed."  Doe v. Delie, 257 F.3d 309, 313 (3d Cir. 2001) (citing New Jersey Turnpike Auth. v. Jersey Cent. Power & Light, 772 F.2d 25, 31 (3d Cir. 1985)).  The United States Court of Appeals for the Third Circuit has explained that "'mootness has two aspects: (1) the issues presented are no longer "live" or (2) the parties lack a cognizable interest in the outcome.'"  Id. (quoting New Jersey Turnpike Auth., 772 F.2d at 31).  Since Maldonado has been released, he is no longer in the custody of the DOC and any injunctive relief

regarding medical treatment provided by the DOC "would have no impact on him, and therefore his equitable claims are moot." Id.

Plaintiffs contend that Maldonado's claims fall under the "inherently transitory" exception to the mootness doctrine. However, the cases upon which they rely concern whether a putative class representative plaintiff can continue to seek class certification after his individual claim has become moot. See Gerstein v. Pugh, 420 U.S. 103, 110 n.11 (1975); United States Parole Comm'n v. Geraghty, 445 U.S. 388, 404 (1980); Richardson v. Bledsoe, 829 F.3d 273, 279 (3d Cir. 2016). Plaintiffs have pointed to no authority for the proposition that an individual can continue to seek relief as to his own personal claim once that claim has become moot.

The DOC Defendants concede that Maldonado has "standing to bring and maintain this action on behalf of the class members regardless of [his] own individual claims being moot." (DOC Defs.' Reply at 18.) They argue only that his individual claim should be dismissed as moot because he is no longer incarcerated by the DOC. We agree. Accordingly, we grant the DOC Defendants' Motion for Summary Judgment as to their argument that Maldonado's individual claim for injunctive relief in Count I of the First Amended Complaint should be dismissed as moot.

The DOC Defendants also argue that we should dismiss Chimenti's claim for injunctive relief in Count I as moot because he has already received the requested relief. See Hollihan v. Pa. Dep't of Corr., 159 F. Supp. 3d 502, 509 (M.D. Pa. 2016) (dismissing claim for injunctive relief seeking an order requiring the DOC to provide plaintiff with cataract surgery after plaintiff received the cataract surgery). As we discussed above, Plaintiffs seek an injunction that will require Defendants to implement a Hepatitis C treatment policy that meets community standards of care; treat members of the Class with medically necessary and appropriate DAAs and provide ongoing monitoring and medical care to class members that is appropriate for their individual level

of liver fibrosis and cirrhosis, including evaluation by a hepatologist and assessment regarding

their need for partial or full liver transplant. (1st Am. Compl. ¶ 98.) Chimenti has already received

treatment with DAAs and, accordingly, no longer personally needs the second of the three items

in the requested injunction. (PCSAF ¶ 236; DRPCAF ¶ 236.) However, there is no basis on the

record before us upon which we could determine that Chimenti has no interest in requiring the

DOC Defendants to formulate and implement a policy for the treatment of Hepatitis C that meets

community standards of care or that he no longer needs monitoring and medical care for cirrhosis

or liver fibrosis and access to treatment by a hepatologist. Indeed, Chimenti's medical expert, Dr.

Bennet Cecil, has opined that Chimenti still has a liver lesion and suffers from diabetes, severe

fatigue, and memory problems relating to hepatic encephalopathy. (Pls.' Ex. Q at 1.) We conclude

that Chimenti's claim for injunctive relief is not moot and we deny the DOC Defendants' Motion

for Summary Judgment as to this issue.

### 2. Exhaustion of Administrative Remedies

The DOC Defendants argue that they are entitled to summary judgment as to Leyva's claim

for injunctive relief in Count I because he failed to exhaust his administrative remedies prior to

filing this lawsuit. The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall

be brought with respect to prison conditions under section 1983 of this title, or any other Federal

law, by a prisoner confined in any jail, prison, or other correctional facility until such

administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Specifically, the

DOC Defendants argue that Leyva did not exhaust his administrative remedies prior to filing suit

because the DOC's Secretary's Office of Inmate Grievances and Appeals did not issue a decision

at the third and final level with respect to Leyva's second grievance until September 8, 2015, nearly

three months after this action was initiated on June 12, 2015. "If exhaustion is incomplete when

an inmate files suit, dismissal is mandatory." Turner v. Sec'y Pa. Dep't of Corr., 683 F. App'x 180, 182 n.1 (3d Cir. 2017) (citing Porter v. Nussle, 534 U.S. 516, 524 (2002); and Nyhuis v. Reno, 204 F.3d 65, 77 n.12 (3d Cir. 2000)). Moreover, "[a]n inmate cannot cure non-compliance with [the PLRA] by exhausting remedies after filing his complaint." Id. (citation omitted).

However, we concluded in our May 24, 2018 Memorandum and Opinion granting Plaintiffs' Motion for Class Certification that the doctrine of vicarious exhaustion applies in this case. See Chimenti v. Wetzel, Civ. A. No. 15-3333, 2018 WL 2388665, at *5 (E.D. Pa. May 24, 2018). The United States Court of Appeals for the Eleventh Circuit has explained that, pursuant to this doctrine, "a class of prisoner-plaintiffs certified under Rule 23(b)(2) satisfies the PLRA's administrative exhaustion requirement through 'vicarious exhaustion,' i.e., when 'one or more class members ha[s] exhausted his administrative remedies with respect to each claim raised by the class.'" Chandler v. Crosby, 379 F.3d 1278, 1287 (11th Cir. 2004) (alteration in original) (quoting Jones 'El v. Berge, 172 F. Supp. 2d 1128, 1133 (W.D. Wis. 2001); and citing Hattie v. Hallock, 8 F. Supp. 2d 685, 689 (N.D. Ohio 1998)). Vicarious exhaustion "advances the purpose of administrative exhaustion, which . . . 'is to put the [administrative authority] on notice of all issues in contention and to allow the [authority] an opportunity to investigate those issues.'" Id. (alterations in original) (quoting Griffin v. Carlin, 755 F.2d 1516, 1531 (11th Cir. 1985)). Since Defendants do not dispute that both Chimenti and Maldonado exhausted their administrative remedies prior to filing suit pursuant to the PLRA, we conclude Leyva's PLRA exhaustion requirement is satisfied through vicarious exhaustion. We thus deny the DOC Defendants' Motion for Summary Judgment as to their argument that Leyva's claim for injunctive relief in Count I should be dismissed for failure to exhaust administrative remedies.

Defendants also argue that we should dismiss the claims brought in Count I as to all but seven of the members of the Class, because only seven members of the Class properly exhausted their administrative remedies pursuant to the PLRA before this action was filed. As we discussed above, we have concluded that vicarious exhaustion applies in this case. Since there is no dispute that both Chimenti and Maldonado exhausted their administrative remedies pursuant to the PLRA prior to filing suit, we conclude that the PLRA exhaustion requirement is satisfied through vicarious exhaustion as to all of the members of the class who did not personally exhaust their administrative remedies with respect to the claims asserted in Count I of the First Amended Complaint. We thus deny the DOC Defendants' Motion for Summary Judgment as to their argument that the claims asserted in Count I should be dismissed as to all but seven members of the Class for failure to exhaust administrative remedies.

3.     Standing

Defendants argue that future inmates of the DOC lack standing to assert claims in this case and should be dismissed as plaintiffs in this action. Specifically, Defendants contend that the definition of the class includes individuals who are not yet inmates in the custody of the DOC and that the named Plaintiffs lack standing to assert claims on behalf of those individuals. However, the definition of the class includes only "all persons who are **currently incarcerated** in a Pennsylvania Department of Corrections facility with a diagnosed condition of chronic Hepatitis C." (5/24/18 Order, Docket No. 108 (emphasis added).) Since the class does not include any individuals who are not "currently incarcerated" in a DOC facility, we deny the DOC Defendants' Motion for Summary Judgment as to this argument.

4. <u>Deliberate indifference</u>

The DOC Defendants also argue that they are entitled to the entry of summary judgment in their favor as to Count I because the factual record does not support Plaintiffs' claim that the DOC Defendants were deliberately indifferent to Plaintiffs' serious medical needs. Count I asserts a claim pursuant to 42 U.S.C. § 1983 for violation of Plaintiffs' rights under the Eighth Amendment based on the denial of medical care for their chronic HCV. Section 1983 provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. "Section 1983 provides remedies for deprivations of rights established in the Constitution or federal laws. It does not, by its own terms, create substantive rights." <u>Kaucher v. Cty. of Bucks</u>, 455 F.3d 418, 423 (3d Cir. 2006) (footnote omitted) (citing <u>Baker v. McCollan</u>, 443 U.S. 137, 145 n.3 (1979)). Consequently, in order to obtain relief pursuant to § 1983, "a plaintiff must demonstrate [that] the defendant, acting under color of state law, deprived him or her of a right secured by the Constitution or the laws of the United States." <u>Id.</u> (citing <u>Am. Mfrs. Mut. Ins. Co. v. Sullivan</u>, 526 U.S. 40, 49-50 (1999), and <u>Mark v. Borough of Hatboro</u>, 51 F.3d 1137, 1141 (3d Cir. 1995)).

Count I alleges that the Defendants' "acts and omissions in failing to provide adequate medical care constitute a deliberate indifference to the serious medical needs of prisoners infected with Hepatitis C, thereby establishing a violation of the Eighth Amendment to the United States Constitution." (1st. Am. Compl. ¶ 90.) The Eighth Amendment's right to be free from cruel and unusual punishment, which applies to the states via the Fourteenth Amendment, <u>Robinson v.</u>

California, 370 U.S. 660, 675 (1962), "imposes duties on [prison] officials, who must . . . ensure that inmates receive . . . medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" Farmer v. Brennan, 511 U.S. 825, 832 (1994) (quoting Hudson v. Palmer, 468 U.S. 517, 526-27 (1984) (additional citations omitted)). To succeed on a claim under the Eighth Amendment for denial of medical care, a plaintiff must establish that a defendant showed "[1] deliberate indifference to [2] serious medical needs of [a] prisoner[ ]." Estelle v. Gamble, 429 U.S. 97, 104 (1976). Courts have consistently held that "mere allegations of malpractice" are not sufficient to allege "deliberate indifference." Id. at 106 n.14.

"Deliberate indifference can be shown by a prison official 'intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed.'" Rhines v. Bledsoe, 388 F. App'x 225, 227 (3d Cir. 2010) (quoting Estelle, 429 U.S. at 104-05). "A medical need is serious if it 'has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention.'" Id. (quoting Monmouth Cty. Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987)). Moreover, the medical need must be such that "'a failure to treat can be expected to lead to substantial and unnecessary suffering, injury, or death.'" Tsakonas v. Cicchi, 308 F. App'x 628, 632 (3d Cir. 2009) (quoting Colburn v. Upper Darby Twp., 946 F.2d 1017, 1023 (3d Cir. 1991)).

A prison official acts with deliberate indifference to a serious medical need "when he knows of and disregards an excessive risk to inmate health or safety." Brown v. Thomas, 172 F. App'x 446, 450 (3d Cir. 2006) (citing Farmer, 511 U.S. at 837). "The official must be aware of the facts from which an inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. (citation omitted). The Supreme Court has instructed that we should distinguish "'deliberate indifference to serious medical needs of prisoners,'" from

14

"'negligen[ce] in diagnosing or treating a medical condition,'" because "only the former violates the [Cruel and Unusual Punishments] Clause." <u>Farmer</u>, 511 U.S. at 835 (first alteration in original) (quoting <u>Estelle</u>, 429 U.S. at 106).   Therefore "Eighth Amendment liability requires 'more than ordinary lack of due care for the prisoner's interests or safety,'" <u>id.</u> (quoting <u>Whitley v. Albers</u>, 475 U.S. 312, 319 (1986)), and "[a]llegations of medical malpractice are not sufficient to establish a Constitutional violation." <u>Spruill v. Gillis</u>, 372 F.3d 218, 235 (3d Cir. 2004).   The Third Circuit has "'found "deliberate indifference" in a variety of circumstances, including where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment.'" <u>Parkell v. Danberg</u>, 833 F.3d 313, 337 (3d Cir. 2016) (quoting <u>Rouse v. Plantier</u>, 182 F.3d 192, 197 (3d Cir. 1999)).   The DOC Defendants argue that Plaintiffs cannot establish that they have been deliberately indifferent to inmates' serious medical needs because the DOC has a Hepatitis C Policy and it has treated, or is in the process of treating, all inmates with chronic HCV who have serious medical needs.

### a.   The Hepatitis C Protocol

The DOC Defendants contend that they are entitled to summary judgment as to Count I of the First Amended Complaint because the DOC has adopted a Hepatitis C Protocol that provides for treatment with DAAs for some inmates with chronic HCV and thus, they are not deliberately indifferent to inmates' serious medical needs.   As we described above, after first denying treatment with DAAs to all inmates with chronic HCV, the DOC adopted the Interim Hepatitis C Protocol in November 2015, pursuant to which some, but not all, inmates with cirrhosis were prioritized for treatment with DAAs.   (SMF ¶ 53; PRSMF ¶ 53; Pls.' Ex. P § F.)   A year later, on November 7, 2016, the DOC adopted the Hepatitis C Protocol, which prioritizes DAA treatment of inmates with

chronic HCV. (SMF ¶ 40; PRSMF ¶ 40; DOC Defs.' Ex. J § H..) Pursuant to these Protocols, the DOC has treated inmates with Metavir scores of F3 and F4. (Noel Decl., DOC Defs.' Ex. N., ¶ 14.) The DOC intends to continue treating inmates with Metavir scores of F3 and F4 and expects to treat inmates with Metavir scores of F2 in 2018. (Id. ¶¶ 14-15.)

Plaintiffs maintain that Defendants are not entitled to summary judgment as to Count I of the First Amended Complaint just because the DOC has adopted the Hepatitis C Protocol. Plaintiffs contend both that the DOC Defendants can always change the Protocol once this case is over, and that the adoption of the Protocol itself was deliberately indifferent to the serious medical needs of inmates with chronic HCV. Plaintiffs rely on Knox v. Service Employees Int'l Union, Local 1000, 567 U.S. 298 (2012), in which the Supreme Court explained that "[t]he voluntary cessation of challenged conduct does not ordinarily render a case moot because a dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed." Id. at 307 (citing City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 289 (1982)); see also Already, LLC v. Nike, Inc., 568 U.S. 85, 91 (2013) ("[A] defendant cannot automatically moot a case simply by ending its unlawful conduct once sued. Otherwise, a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends." (citing City of Mesquite, 455 U.S. at 289)). Consequently, "'a defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur.'" Sourovelis v. City of Phila., 103 F. Supp. 3d 694, 701 (E.D. Pa. 2015) (quoting Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 190, (2000)).

Plaintiffs argue that the Hepatitis C Protocol is an administrative protocol that has no force of law and can be changed, amended, or terminated at any time and, thus, there is nothing to prevent the DOC from stopping treatment of inmates with DAAs in the future. The DOC Defendants have put forth no evidence that shows that "the allegedly wrongful behavior could not reasonably be expected to recur." Sourovelis, 103 F. Supp. 3d at 701 (quotation omitted).

Plaintiffs also argue that the record shows that the DOC Defendants adopted the current protocol because it limits the number of inmates who will be treated with DAAs for reasons other than medical need. There is record evidence that the DOC chose not to treat any inmates with DAAs in 2014 because of the cost. (Noel Dep., DOC Defs.' Ex. K, at 80-81.) There is also evidence that the DOC's restriction of treatment with DAAs to inmates with Metavir scores of F3 and F4 under the Hepatitis C Protocol was based on the cost of treatment, not medical recommendations or the treatment protocols used by other prisons. Indeed, Dr. Noel rejected advice that he received from Dr. Scharff, then the DOC Chief of Clinical Services, Bureau of Health Care Services, and Eugene Ginchereau, Assistant State Medical Director, that patients with an APRI score of 1.0 or greater should be treated with DAAs, informing Dr. Scharff and Mr. Ginchereau that: "[o]ut of 6,000 DOC inmates who were Hep C, 700 had an APRI score of greater than 1.0. For purposes of establishing the magnitude of treating them all, it would be 700 x $100,000 or $70 million . . . . Somehow, I'm going to have to further prioritize this number." (Id. at 81-82; Pls.' Ex. L.) Dr. Noel confirmed during his deposition that the only prioritization factor that he was considering at that time was cost. (Noel Dep. at 82.) So, in Dr. Noel's opinion, even though an APRI score of 1.0 might qualify an inmate for DAA treatment in other prison systems, the DOC would have to "find a higher APRI score." (Id.) An email that Dr. Noel sent to Dr.

Cowan, Rich Wenhold, Christopher Oppman,[4] and others on February 18, 2016, shows that Noel was guided by the desire to limit the number of inmates who would be eligible for treatment with DAAs when he helped to develop the Hepatitis C Protocol:

> Carl, Thanks for sharing your recommendations on how to update our Hepatitis C Protocol. I do not doubt the elastograhy science or the improvements in defending the Protocol, but I need to operationalize this within our current fiscal realities. It does not help us if the use of elastography provides us a bucket of potential patients which is too large to treat in a timely fashion.[5]

(Pls.' Ex. L.)

We conclude that there is evidence on the record that the DOC's prioritization of its treatment of inmates with DAAs pursuant to the Hepatitis C Protocol is influenced by the cost of that treatment rather than solely by the medical needs of inmates with chronic HCV and, thus, that the DOC has delayed necessary medical treatment for a non-medical reason. See Parkell, 833 F.3d at 337 (citation omitted).[6] Moreover, there is no record evidence that there is anything to prevent

---

[4] Dr. Jay Cowan is the statewide Medical Director for Correct Care Solutions, LLC. (1st Am. Compl. ¶ 13; Medical Defs.' Ans. to 1st Am. Compl. ¶ 13.) Rich Wenhold is the Infection Control Coordinator at the DOC. (Wenhold Decl., Pls.' Ex. I, ¶ 2.) Christopher H. Oppman is the Deputy Secretary of Administration for the DOC and was previously the Director of the Bureau of Health Care Services of the DOC. (Oppman Dep., DOC Defs.' Ex. M, at 6; Pls.' Ex. E.)

[5] Elastopgraphy "images the liver tissue and provides a measure of fibrosis or cirrhosis." (Trooskin Rpt., Pls.' Ex. A, at 8.) It is a more precise test than the APRI score. (Id.; Noel Dep. at 110-11.) Elastography shows the stiffness or elasticity of the liver and gives a reading that can be equated to a fibrosis score of F0 to F4. (Cowan Dep., DOC Defs.' Ex. L, at 43-44.) Dr. Cowan is of the opinion that elastography is "becoming the kind of a new gold standard . . . in . . . determining the F score." (Id. at 44.) The DOC has purchased an elastography machine, which is located at SCI Benner, and which the DOC can use to test up to 15 patients per month. (Noel Dep. at 113.) The DOC has no plans to purchase additional elastography machines. (Id.)

[6] The DOC Defendants argue that reliance on non-medical factors in treatment decisions, such as cost and administrative convenience, does not equate to deliberate indifference to serious medical needs. However, "while 'administrative convenience and cost may be, in appropriate circumstances, *permissible* factors for correctional systems to consider in making treatment decisions, the Constitution is violated when they are considered to the *exclusion of reasonable medical judgment* about inmate health.'" Allah v. Thomas, 679 F. App'x 216, 220 (3d Cir. 2017)

the DOC from changing the Hepatitis C Protocol after the conclusion of this litigation. Under these circumstances, we conclude that there is a genuine issue of material fact regarding whether DOC Defendants are deliberately indifferent to the serious medical needs of inmates with chronic HCV notwithstanding their adoption of the Hepatitis C Protocol. Accordingly, we decline to grant summary judgment to the DOC Defendants with respect to Count I because the DOC has adopted the Hepatitis C Protocol.

<b>b.    <u>Inmates with F0 to F1 fibrosis scores</u></b>

The DOC Defendants argue that they are entitled to summary judgment as to Count I because those inmates who do not qualify for treatment with DAAs under the Hepatitis C Protocol do not currently have serious medical needs. The DOC Defendants rely on the report of their expert, Dr. Kendig, who opined that patients with Metavir scores of F0 to F2 "are at low risk for rapid progression to severe liver disease, [and] therefore they are not at imminent risk of physical injury without immediate treatment with DAA therapies." (Kendig Rpt., DOC Defs.' Ex. Q, at 5.) Dr. Kendig has further opined that prioritizing treatment of DAAs to first treat only inmates with Metavir scores of F3-F4 is appropriate:

> This prioritization approach is warranted in the correctional setting due to the enormous number of inmates who have chronic HCV infection; the associated logistical and security challenges for immediately treating all inmates with HCV; the questionable cost effectiveness of immediately treating persons with HCV who have no or minimal liver disease; [and] the very high treatment costs for DAA therapies . . . .

---

(quoting <u>Roe v. Elyea</u>, 631 F.3d 843, 863 (7th Cir. 2011)). Since the record contains evidence that Dr. Noel considered cost to the exclusion of other factors in formulating the Hepatitis C Protocol (<u>see</u> Noel Dep. at 82), we conclude that there is record evidence that the DOC Defendants were deliberately indifferent to the medical needs of inmates with HCV in their formulation of the Hepatitis C Protocol.

(Id.)  Dr. Kendig concluded that "the Pennsylvnaia DOC hepatitis C protocol is medically appropriate and is consistent with the correctional standard of health care as of July 2017" and that the Hepatitis C Protocol "does not place inmates with chronic HCV infection at a substantial and unnecessary risk for severe illness and death."  (Id.)

The DOC Defendants also contend that their prioritization of inmates for treatment with DAAs is not inconsistent with the medical treatment given to individuals infected with HCV outside of the correctional setting.  The DOC Defendants rely on evidence that some insurance companies restrict treatment with DAAs based on "disease severity as measured by Metavir Score."  (Trooskin Dep., DOC Defs.' Ex. T, at 27.)  In addition, prior to July 1, 2017, Pennsylvania's Medicaid program did not pay for treatment with DAAs for persons infected with HCV who had Metavir scores of F1 or F0.  (Id.)

Plaintiffs argue that there is evidence of record that inmates with chronic HCV who have Metavir scores of F0 to F2 do have serious medical needs and should be treated with DAAs.  The American Association for the Study of Liver Diseases ("AASLD"), "recommend[s] treatment for all patients with chronic HCV infection, except those with a short life expectancy that cannot be remediated by HCV treatment, liver transplantation, or another directed therapy."  (Pls.' Ex. C at 1.)  According to the AASLD, "[p]atients who are cured of their HCV infection experience numerous health benefits, including a decrease in liver inflammation . . . and a reduction in the rate of liver fibrosis progression."  (Id. at 2 (citation omitted).)  In addition, studies reviewed by the AASLD showed that curing HCV, referred to as sustained virologic response ("SVR"), resulted in the resolution of cirrhosis in 49% of cases reported, a "70% reduction in the risk of liver cancer," and a "90% reduction in the risk of liver-related mortality and liver transplantation."  (Id. (citations omitted).)  The AASLD also reported that studies show clear benefits from treating patients at the

early stages of fibrosis, specifically patients with Metavir scores less than F2. According to the AASLD, "a long-term follow-up study" showed that patients at Metavir stage F0 or F1 fibrosis who achieved SVR and who were followed for up to twenty years had better 15-year survival rates than patients at Metavir stage F0 or F1 who were not treated. (Id.) The AASLD has also recognized that "[t]reatment delay may decrease the benefit of SVR." (Id.)

Dr. Trooskin has opined that patients with Metavir scores below F2 are at risk for serious medical problems if they remain untreated:

> A significant number of persons with chronic HCV who have no or mild fibrosis (commonly described as F0-F1) will progress to cirrhosis in the absence of treatment. Currently, there is no way to predict who in this cohort will develop advanced liver disease. Delaying treatment for patients until they develop advanced liver disease leads to significant suffering, increased risk of cancer, need for liver transplants, and death. Patients who are unable to obtain curative treatment are at high risk for anxiety, illness uncertainty (the inability to determine the meaning of illness-related events), and depression, regardless of fibrosis stage. Patients who are cured of HCV report a significant improvement in their mental well-being. As the disease progresses, so does the risk of a host of medical problems, including HCV-associated heart disease, lymphatic cancers, particularly non-Hodgkin Lymphoma, kidney damage and immune related rheumatoid [arthritis]. Studies show that HCV infection increases the risk of insulin resistance and diabetes by almost four times. Diabetes increases the risk of liver cancer in people living with HCV. . . .

> Individuals who meet the standards set forth by the AASLD and IDSA, but who are excluded from receiving care, are put at a significant risk of many medical complications of HCV. HCV is known to have extrahepatic manifestations, described as effects on organ systems outside the liver. Without treatment, individuals may be needlessly exposed to depression, fatigue, sore mucles, joint pain, kidney injury, diabetes or glucose intolerance, certain types of rashes or autoimmune diseases. Without treatment, individuals with HCV are at increased risk of developing cirrhosis, liver cancer and liver failure requiring transplant. Furthermore, once individuals develop advanced liver disease they must undergo cancer screening at regular intervals for the rest of their life even after they are cured of their HCV.

(Trooskin Rpt., Pls.' Ex. A, at 5.) Dr. Trooskin has also opined that delaying treatment of individuals who have chronic HCV may result in "adverse effects including increasing the risk of

death, causing irreversible liver damage, and needlessly prolonging suffering associated with the disease." (Id. at 6.) Delaying treatment with DAAs "can cause damage to other vital organs" and "cause heart attacks, fatigue, joint pain, depression, sore muscles, arthritis, and, at times, premature death." (Id. (citation omitted).)

Dr. Cowan testified at his deposition that the symptoms exhibited by individuals with chronic HCV may not be correlated to their Metavir scores. (Cowan Dep., DOC Defs.' Ex. L, at 49-50.) Individuals with chronic HCV may suffer from extrahepatic and nonhepatic conditions such as mixed cryoglobulinemia, skin rash, kidney disease, and fatigue. (Id. at 50-51.) Moreover, individuals with Metavir scores of F1 may suffer from serious fatigue, anorexia, loss of appetite, headache, jaundice, and ascites (fluid in the abdomen). (Id. at 52-53.) Dr. Noel also testified that severe fatigue could be a symptom of HCV at any stage, including F1 and F2. (Noel Dep., DOC Defs.' Ex. K, at 125, 142.) Dr. Kendig has also testified that "fatigue has been associated with Hepatitis C at all stages" and that patients can suffer from extrahepatic manifestations of chronic HCV when their Metavir scores are F0 and F1. (Kendig Dep., DOC Defs.' Ex. R, at 39-40.)

Plaintiffs also argue that the DOC is deliberately indifferent to the serious medical needs of inmates with chronic HCV because it is prioritizing patients based on imprecise tests that may miss patients who may otherwise be entitled to treatment with DAAs under the Hepatitis C Protocol. As we discussed earlier, both Dr. Noel and Dr. Cowan acknowledge that APRI scores are only indirect markers of fibrosis and APRI scores at the 1.5 to 2 level only have "a sensitivity accuracy of about 48 percent." (Cowan Dep. at 42; see also Noel Decl., DOC Defs.' Ex. N, ¶ 23.) Consequently, using APRI scores could mean missing cirrhosis in half of inmates with APRI scores at the 1.5 to 2 level. (Cowan Dep. at 42.) In addition, an APRI score of 1 would miss approximately 23% of patients with cirrhosis. (Cowan Dep. at 42-43.)

We conclude that the record contains evidence that patients who have chronic HCV and whose Metavir scores are less than F2 have serious medical needs, as they may suffer from fatigue and other nonhepatic symptoms of their infections and, if not treated with DAAs before their disease progresses, may suffer from liver inflammation, liver fibrosis, liver cancer and liver-related mortality that they would not suffer if they were treated with DAAs while their Metavir scores are in the F0 to F1 range. See Tsakonas, 308 F. App'x at 632. There is also evidence that the DOC's reliance on an inaccurate method of testing for fibrosis could result in the DOC's failing to treat many individuals who suffer from advanced fibrosis and cirrhosis. Based on all of the above, we further conclude that there is record evidence that raises a genuine issue of material fact regarding whether inmates who have chronic HCV but whose APRI scores do not yet correlate to Metavir scores of F3 and F4 have serious medical needs that the DOC Defendants are deliberately refusing to treat for non-medical reasons, such as cost. Accordingly, we deny the DOC Defendants' Motion for Summary Judgment insofar as they argue that they are entitled to summary judgment on Count I because inmates who have been categorized as having Metavir scores of F0 to F1 do not have serious medical needs.

B.    Count II

The DOC Defendants argue that they are entitled to summary judgment on Count II, in which Plaintiffs seek injunctive relief for alleged violations of Article I, Section 13 of the Pennsylvania Constitution, because the Commonwealth has not waived its immunity as to this claim.[7] The DOC Defendants rely on Pennsylvania's sovereign immunity statute, which provides as follows:

---

[7] Article I, § 13 of the Pennsylvania Constitution provides that "Excessive bail shall not be required, nor excessive fines imposed, nor cruel punishments inflicted." Pa. Const. art. I, § 13.

> Pursuant to section 11 of Article 1 of the Constitution of Pennsylvania, it is hereby declared to be the intent of the General Assembly that the Commonwealth, and its officials and employees acting within the scope of their duties, shall continue to enjoy sovereign immunity and official immunity and remain immune from suit except as the General Assembly shall specifically waive the immunity.

1 Pa. Cons. Stat. Ann. § 2310. The General Assembly has specifically waived sovereign immunity in nine areas, which apply only to negligence suits for damages. See 42 Pa. Cons. Stat. Ann. § 8522. "[T]he General Assembly has not waived immunity for equitable claims seeking affirmative action by way of injunctive relief." Collins v. State, No. 96 M.D. 2013, 2013 WL 5874770, at *3 (Pa. Commw. Ct. Oct. 31, 2013) (citing Bonsavage v. Borough of Warrior Run, 676 A.2d 1330, 1331 (Pa. Cmmw. Ct. 1996)). See also Bonsavage, 676 A.2d at 1331 ("[T]he General Assembly has waived sovereign immunity only for actions against Commonwealth parties 'for **damages** arising out of a **negligent** act.' Significantly, the General Assembly has not waived immunity for **equitable** claims seeking affirmative action by way of injunctive relief."); Swift v. Dep't of Transp., 937 A.2d 1162, 1168 (Pa. Commw. Ct. 2007) ("The General Assembly has not waived immunity for equitable claims seeking affirmative action by way of injunctive relief." (citing Bonsavage, 676 A.2d 1330)); Cornish v. City of Phila., Civ. A. No. 14-6920, 2015 WL 3387052, at *9 (E.D. Pa. May 26, 2015) (dismissing medical care claim for injunctive relief brought against the DOC pursuant to Art. 1, § 13 of the Pennsylvania Constitution because the "DOC as a Commonwealth agency is entitled to sovereign immunity from [plaintiff's] state constitutional claims for both equitable relief and damages"). We conclude that Pennsylvania has not waived its sovereign immunity with respect to Plaintiffs' claim for injunctive relief for violation of Article I, Section 13 of the Pennsylvania Constitution and we grant the Motion for Summary Judgment as to Count II of the First Amended Complaint.

C. <u>Count III</u>

The DOC Defendants argue that they are entitled to summary judgment as to Chimenti's medical malpractice claim in Count III of the First Amended Complaint because the evidence of record is not sufficient to establish a causal relationship between their alleged failure to conform to the appropriate standard of care and injury to Chimenti. To succeed on a medical malpractice claim, a plaintiff "is required to establish 'that 1) the medical practitioner owed a duty to [him]; 2) the practitioner breached that duty; 3) the breach was the proximate cause of, or a substantial factor in, bringing about the harm [that he suffered]; and 4) the damages suffered were the direct result of the harm.'" <u>Osborne v. Lewis</u>, 59 A.3d 1109, 1114-15 (Pa. Super. Ct. 2012) (alterations in original) (quoting <u>Carrozza v. Greenbaum</u>, 866 A.2d 369, 379 (Pa. Super. Ct. 2004)). "'When a party must prove causation through expert testimony the expert must testify with reasonable certainty that in his professional opinion, the result in question did come from the cause alleged.'" <u>Reyes v. Otis Elevator Co.</u>, Civ. A. No. 13-4379, 2016 WL 6495115, at *4 (E.D. Pa. Nov. 2, 2016) (quoting <u>Cohen v. Albert Einstein Med. Ctr., N. Div.</u>, 592 A.2d 720, 723 (Pa. Super. Ct. 1991)). Thus, "[u]nder Pennsylvania law, medical experts opining on causation must testify that defendant's actions caused plaintiff's condition with a reasonable degree of medical certainty." <u>McLeod v. Dollar Gen.</u>, Civ. A. No. 13-3113, 2014 WL 4634962, at *4 (E.D. Pa. Sept. 16, 2014) (citing <u>In re Paoli R.R. Yard PCB Litig.</u>, 35 F.3d 717, 750 (3d Cir. 1994)). The Pennsylvania Superior Court has explained that "'an expert fails this standard of certainty if he testifies that the alleged cause possibly, or could have[,] led to the result, that it could very properly account for the result, or even that it was very highly probable that it caused the result.'" <u>Id.</u> (alteration in original) (quoting <u>Kravinsky v. Glover</u>, 396 A.2d 1349, 1356 (Pa. Super. Ct. 1979)).

Chimenti's medical malpractice claim in Count III relies on the opinion of Dr. Bennet Cecil, who has twenty years of experience in treating patients with HCV. (Pls.' Ex. Q.) Dr. Cecil has expressed the following opinions with "a reasonable degree of medical certainty." (Id.)

> Mr. Chimenti was treated with triple therapy but relapsed necessitating retreatment. A new treatment was available in October 2013 with Sovaldi but Mr. Chimenti was not allowed to have this new treatment. He should have taken Sovaldi, peginterferon and ribavirin at that time. Sovaldi plus Olysio combination therapy were also available but this was also denied. The Department of Corrections should have referred him to a hepatologist then but did not. They also refused to send him to a gastroenterologist. His medical practitioners were not qualified to treat him and his case reflects their errors.

> Harvoni was FDA approved in October 2014 and again Mr. Chimenti was denied treatment. He had life threatening cirrhosis and denial of Harvoni represents deliberate indifference to his life. Lack of treatment injured him and increased his risk of death, liver cancer, worseing [sic] of liver failure and increased the need for a liver transplant in the future.

> In 2015 a liver mass suspicious for liver cancer was found on a scan. The standard of care required referral to a liver cancer specialist and not a general oncologist. He was pressured into agreeing to a liver biopsy. No biopsy meant no treatment. This violated his human rights. The radiologist refused to do the biopsy. The liver lesion has not enlarged and is not considered a liver cancer at this time. There was no medical reason to delay Harvoni while waiting for a liver biopsy. That is not the standard of medical care.

> Harvoni cured his HCV two years late and the delay irreparately [sic] worsened Mr. Chimenti. He has diabetes now likely related to his HCV. He has severe fatigue, memory problems related to hepatic encephalopathy.

> The department of corrections ignored the clear national standards published by the American Association for the Study of Liver Diseases. They improperly mismanaged his life threatening medical condition instead of making a timely referrral [sic] to a hepatologist.

(Id.) We conclude that Dr. Cecil's opinion satisfies the standard of certainty except with respect to his statement that Chimenti's diabetes is "likely related to his HCV" (id.), as this statement fails to comply with the requisite standard of certainty for causation. See McLeod, 2014 WL 4634962, at *4 (quotation omitted).

The DOC Defendants also argue that they are entitled to summary judgment as to Chimenti's medical malpractice claim because Dr. Cecil's report does not specify what actions Dr. Noel took with respect to Chimenti's medical care. The DOC Defendants, however, cite no authority for the proposition that a medical malpractice plaintiff must establish duty and breach of that duty solely through expert testimony and we are aware of none. Plaintiffs have submitted evidence that Dr. Noel was involved in the development of the DOC's interim and final Hepatitis C Protocols and the decision of the DOC to cease all treatment for HCV before it developed a treatment protocol. (Noel Dep., DOC Defs.' Ex K, at 31, 65-66, 68-70; Noel Decl., DOC Defs.' Ex. N, ¶¶ 4-5.) There is also record evidence that Dr. Noel had the final authority to determine whether a particular inmate received DAA treatment, that medical staff consulted him regarding whether to provide DAA treatment to Chimenti, and that he was involved in the decision not to provide DAA treatment to Chimenti. (Noel Dep. at 154-56, 173, 176-78, 183-84, 187.) We conclude, accordingly, that there is sufficient evidence on the record to raise a genuine issue of material fact regarding whether Dr. Noel owed a duty to Chimenti; whether Dr. Noel breached that duty through his involvement in the decision to delay Chimenti's treatment with DAAs; and whether that breach was a substantial factor in causing Chimenti to suffer severe fatigue, memory problems and increased risk of death, liver cancer, worsening of liver failure and an increased need for a liver transplant in the future. See Osborne, 59 A.3d at 1114-15 (quotation omitted). We therefore grant the DOC Defendants' Motion for Summary Judgment as to Count III of the First Amended Complaint with respect to Dr. Cecil's opinion that the DOC's failure to treat Chimenti with DAAs in 2013 and 2014 was likely to have caused his diabetes and we deny the DOC's Motion for Summary Judgment as to Count III of the First Amended Complaint in all other respects.

## IV.    CONCLUSION

For the reasons stated above, we grant the DOC Defendants' Motion for Summary Judgment as to the following:  (1) Maldonado's personal claim for injunctive relief pursuant to 42 U.S.C. § 1983 in Count I of the First Amended Complaint; (2) Plaintiffs' claim for injunctive relief for violation of Article I, Section 13 of the Pennsylvania Constitution in Count II of the First Amended Complaint; and (3) that portion of Chimenti's claim for medical malpractice in Count III of the First Amended Complaint that pertains to Dr. Cecil's opinion that Chimenti's diabetes is likely related to his HCV.  The Motion for Summary Judgment is denied in all other respects. Accordingly, Plaintiffs may proceed with respect to their claims against the DOC Defendants for injunctive relief on behalf of Chimenti, Leyva, and the Class in Count I; Chimenti's claim for monetary damages in Count I; and the remainder of Chimenti's claim for medical malpractice in Count III.  An appropriate Order follows.

BY THE COURT:

/s/ John R. Padova

_____

John R. Padova, J.